UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 3:17-cr-01354-GPC |
|---|---|
| Plaintiff, | **ORDER DENYING MOTION TO SUPPRESS** |
| v. | |
| YONEL QUINTERO-BERNAL, | **[ECF No. 25]** |
| Defendant. | |

Before the Court is Defendant Yonel Quintero-Bernal's motion to suppress evidence found in his vehicle during a traffic stop, and later, his apartment. (ECF No. 25.) The instant motion was filed on October 19, 2017, and the government filed a response in opposition on November 2, 2017 (ECF No. 27). The Court held an evidentiary hearing on the suppression motion on November 9.[1] (ECF No. 28.) Based on the evidence presented by the parties, and for the reasons set forth below, the Court

---

[1] At the conclusion of the evidentiary hearing, the Court ordered the parties to file supplemental briefing concerning the applicability of the collective knowledge doctrine. The government attached to its supplemental brief a declaration by a DEA agent who did not testify at the evidentiary hearing (ECF No. 30-1), and later moved to reopen the evidentiary hearing to present the agent's testimony (ECF No. 33). The Court denied the motion to reopen because it could not find good cause to do so. (ECF No. 35.) The Court therefore reaches its decision based only upon the evidence offered by Defendant with his motion to suppress and any additional evidence presented at the November 9 hearing.

1

DENIES the motion to suppress.

I. Evidence

    a. **Testimony of Officer Walker**

During the evidentiary hearing, Officer Jordan Walker offered the following relevant testimony. On April 27, 2017, Walker and his police dog were working as a part of a special border crime detail known as Operation Stone Garden. (Evidentiary Hr'g Tr. at 6.) At some point that day, Detective Juns, a federal narcotics detective involved in a regional narcotics task force, called Walker on Walker's cell phone and "told [Walker] he believed the driver of [Defendant's] vehicle was involved in narcotics activity and was potentially transporting an illegal substance to El Cajon." (*Id.* at 6, 14–15.) Juns instructed Walker to "find independent probable cause to initiate a traffic stop on the vehicle," and after obtaining it, "have [the] narcotics dog do a sniff of the vehicle." (*Id.* at 7.) Walker could not remember exactly what Juns had told him about Defendant, but stated:

> [Juns] told me they -- by 'they,' I am not sure who 'they' was -- a member of the task force had purchased I believe a quarter pound of methamphetamine from the defendant, and he was supposed to be the operator of the vehicle. They had a tracker on the vehicle.

(*Id.* at 27.)

Walker found Defendant's vehicle, and while tailing Defendant, observed Defendant enter a "left-turn pocket" without signaling. (*Id.*) Walker then initiated the traffic stop, which occurred after both vehicles turned left at the upcoming intersection. (*Id.*) After initiating the stop, Walker activated his body camera. (*Id.* at 16.) Walker approached the driver side door and began speaking to Defendant in English, but Defendant responded only in Spanish. (*Id.* at 24.) Walker testified, however, that Defendant appeared to understand Walker's questions. (*Id.*) Walker noticed that Defendant "was nervous that he had been stopped" and was not making eye contact with Walker. (*Id.* at 8.) Walker requested another officer to assist with the stop. (*Id.*)

Walker told Defendant that he had stopped him because "there was a pair of fuzzy dice hanging from the mirror as well as a figurine affixed to the dashboard," but Walker testified at the hearing that these obstructions were not the reason for stopping Defendant. (*Id.*) When asked at the hearing what the reason for the stop was, Walker stated that it was Defendant's failure to signal his lane change. Walker nonetheless testified that prior to making the stop, he "could clearly see the objects that would have been obstructing [Defendant's] view" in violation of California Vehicle Code § 26708. (*Id.* at 9, 26.)

Walker subsequently brought his police dog out of the vehicle and led the dog around the vehicle twice. (*Id.* at 10.) The dog alerted under the front bumper of the vehicle. (*Id.*) Walker then searched the vehicle and ultimately found methamphetamine in the trunk. (*Id.* at 10–12.) When asked why the dog alerted at the front of the vehicle if the narcotics were in the trunk, Walker explained that the wind likely blew the odor towards the front of the vehicle. (*Id.* at 12.) Walker placed Defendant under arrest. (*Id.*)

### b. Walker's Written Reports

After Defendant was brought to the police station, Walker drafted a report. (ECF No. 25-2, Ex. A.) In the report, Walker states that he initiated the traffic stop because Defendant shifted into the left turn lane without signaling. (*Id.*) The report mentions nothing about objects around Defendant's dash. (*Id.*) The report notes that Defendant told Walker he did not speak English, but "appeared to understand the questions" Walker was asking, and that Defendant "would not tell" Walker why he was in El Cajon. (*Id.*) The report states that Defendant "appeared nervous throughout the contact," "was breathing heavily, had rapid speech, and would not make eye contact with" Walker. (*Id.*) "Given the nature of the detail I was working," Walker writes, "and [Defendant's] behavior, I decided to conduct an exterior narcotics sniff of the vehicle." (*Id.*)

Walker also prepared a "narcotics detection log" in which he describes the traffic stop. (Evidentiary Hr'g Ex. M.) The log entry states that Walker initiated the traffic stop because of Defendant's lane change. (*Id.*) Walker does not discuss Defendant's nervousness, lack of eye contact, or failure to answer Walker's questions.

### c. Body Camera Video

Defendant offered into evidence the recording of the traffic stop taken by Walker's body camera. (Evidentiary Hr'g Ex. L.) The video for the most part corroborates the events as described by Walker. In the video, Walker approaches the vehicle and greets Defendant, asking Defendant how he is doing, and Defendant responds, "good." A die (or pair of dice, it is not clear from the video) is hanging by a string from Defendant's rear-view mirror, and a figurine is on top of the middle of the dash. Walker asks for Defendant's driver's license, registration, and proof of insurance, and Defendant hands Walker his driver's license and another piece of paper. Defendant continues to rummage through papers in his vehicle, presumably looking for his registration or proof of insurance. Meanwhile, Walker relays Defendant's information to dispatch on his handheld radio as he stands next to Defendant's driver-side door.

When Walker asks Defendant if the address listed on the license is current, Defendant recites his address in Spanish. As Defendant speaks with Walker during the first few minutes of the conversation, Defendant periodically turns his head to look at Walker and then returns to looking forward.[2] Three minutes into the stop, Walker tells Defendant that he initiated the traffic stop because Defendant had an object on his dash and dice hanging from his rearview mirror. Around the same time, Defendant removes his sunglasses. Walker again asks Defendant if he speaks any English, and Defendant responds, in Spanish, "Uh little. Very little." (*See* Evidentiary Hr'g Ex. N at 3 (transcript of video with translation).) The two men then fell silent for about two minutes.

Four minutes into the stop, Walker asks Defendant when his driver's license expires. In Spanish, Defendant responds "twenty-three, twenty-five, or something like that. Twenty-five." (*Id.*) Walker asks Defendant if he understands what Walker is saying, and Defendant responds, "Um yeah, little." (*Id.* at 4.) The two again fell silent.

---

[2] At around this time in the video, an unknown pedestrian yells to Walker that his car has been stolen. Walker instructs the pedestrian to sit nearby and wait for Walker to finish with Defendant.

Five minutes into the stop, Walker asks Defendant for the second time what he is doing in El Cajon, and Defendant responds in Spanish that he came to meet a friend who said he could get Defendant a job. Walker instructs Defendant to speak in English, and Defendant responds, in Spanish, that he cannot. Defendant again begins speaking in Spanish. As Defendant speaks, he periodically looks up at Walker and then back down.

Six minutes into the stop, Walker asks for backup. About thirty seconds later, Walker asks Defendant if he has any tattoos. Defendant shows Walker a tattoo and says, in English, "my last name," and points to his arm. Walker then states into his radio, "that's not a match." Seven minutes into the stop, Walker tells Defendant to "hang tight, hang on" and returns to his police vehicle. Walker walks to his vehicle and turns off the audio on the body camera.

Once at his police vehicle, Walker appears to write Defendant's information on a notepad. About nine and a half minutes into the stop, Walker puts Defendant's documents on the outside windshield of the police vehicle, returns to Defendant's vehicle and instructs Defendant to exit his vehicle and sit on the curb. Meanwhile, another officer arrives on the scene.

Eleven minutes into the stop, Walker takes the police dog out of the police vehicle, and leads the dog around Defendant's vehicle. At about fourteen and a half minutes into the stop, the dog alerts at the front of Defendant's vehicle by laying down. Walker then puts Defendant in handcuffs, searches the vehicle, and finds narcotics in Defendant's trunk.

## II. Discussion

Normally, "a dog sniff conducted during a lawful traffic stop does not violate the Fourth Amendment's proscription of unreasonable seizures." *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015) (citing *Illinois v. Caballes*, 543 U.S. 504 (2005)). In *Rodriguez*, however, the Supreme Court clarified that the Fourth Amendment prohibits an officer—in the absence of independent reasonable suspicion that, for example, there is contraband in the vehicle—from prolonging a traffic stop to engage in a dog sniff after

the traffic-related mission of the stop had been "completed." There, a K-9 officer stopped a vehicle because the officer observed the vehicle swerve onto a highway shoulder in violation of Nebraska law. *Id.* at 1612. After collecting documentation from the occupants of the vehicle and questioning them about their journey, the officer completed a records check and called for backup. *Id.* at 1613. The officer issued the driver a written warning, and returned the documentation to the vehicle occupants. *Id.* Without consent, the officer then ordered the driver out of the vehicle, retrieved his dog, and engaged in a dog sniff, leading to the discovery of narcotics inside the vehicle. *Id.*

The Court held that the officer violated the defendant's Fourth Amendment rights by extending the traffic stop beyond the completion of the traffic-related mission. The Court explained that, when an officer initiates a traffic stop, her "mission" includes "determining whether to issue a traffic ticket," as well as "ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615 (internal quotation marks and alterations omitted). These ordinary inquiries are part of the traffic stop's mission because they "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* But a dog sniff, the Court held, is not an "inquiry" that is part of the mission of a traffic stop because it has no relation to ensuring safe and responsible use of the roads. *Id.* Thus, if the traffic-related cause for the traffic stop has extinguished (in *Rodriguez*, by issuing the written warning and returning documentation), independent cause must exist to permit an officer to continue to hold the suspect and engage in a dog sniff.

In light of *Rodriguez*, Defendant's motion to suppress presents the following question: before Walker completed the mission of his traffic stop, did he amass sufficient cause to believe there were narcotics in Defendant's vehicle so as to justify extending the stop for a dog sniff? For the reasons explained below, the Court answers that question in the affirmative, and as a result, Walker's extension of the stop to engage in a dog sniff

did not violate the Fourth Amendment.

Because traffic stops are analogous to *Terry* stops, to meet the Fourth Amendment's requirements, the independent cause allowing Walker to extend the stop to engage in a dog sniff must have raised to the level of reasonable suspicion. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104–05 (9th Cir. 2000). Reasonable suspicion "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc) (emphasis omitted). "Although a mere hunch is insufficient . . . , the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. Reasonable suspicion is a commonsense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) (citations, internal quotation marks, and alterations omitted). This analysis requires examining the totality of the circumstances present at the time of the stop. As such, the Court may not engage in "a 'divide-and-conquer analysis' because even though each of the suspect's acts was perhaps innocent in itself . . . taken together, they may warrant further investigation." *Id.* (internal quotation marks and alterations omitted). In other words, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Id.* at 1078–79 (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).

The relevant facts known to Walker while he was questioning Defendant, considered together, produce a reasonable suspicion that narcotics were in Defendant's vehicle. Walker knew that narcotics investigators had conducted a controlled purchase of methamphetamine from Defendant at some point in the past, and Juns informed Walker that he believed Defendant was potentially transporting an illegal substance to El Cajon. The Court takes no position on whether, without evidence indicating that what Juns told

Walker was true, this relay of information was enough to raise a reasonable suspicion that narcotics were in the vehicle.  But, as part of the totality of the circumstances, this information was undoubtedly relevant to Walker's suspicion.  Walker also was told that the investigators had a "tracker" on the vehicle, suggesting that the investigators had obtained a warrant based on their purchase of narcotics from Defendant.  After stopping Defendant, Walker quickly noticed that Defendant was nervous and was not making eye contact with Walker while speaking.  *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.").  These observations were sufficient to raise a reasonable suspicion that Juns's suggestion that Defendant had illegal substances in his vehicle was correct.  *See e.g.*, *United States v. Henton*, 600 F. App'x 263 (5th Cir. 2015) (reasonable suspicion to believe defendant possessed narcotics existed when officer was told by informants that defendant was in town to sell narcotics and defendant acted nervous and gave conflicting information during the stop); *United States v. Campbell*, 511 F. App'x 424, 428 (6th Cir. 2013) (reasonable suspicion existed when officer observed air fresheners, defendant's nervousness, and knew that defendant had a criminal history); *United States v. Carpenter*, 462 F.3d 981, 987 (8th Cir. 2006) (reasonable suspicion existed when driver avoided drug checkpoint by exiting highway, gave doubtful answer to the officer's questions, and was nervous); *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002) (reasonable suspicion existed when, without any prior knowledge of the driver and passenger, officer observed nervousness, lack of eye contact, inconsistent stories, and that the two were from different states); *United States v. Whitney*, No. 5:08-cr-108-FL, 2009 WL 981832, at *10 (E.D.N.C. Apr. 10, 2009) (reasonable suspicion existed when defendant had large amount of cash, indicating drug activity, and defendant was nervous).

Defendant argues that the video recording of the stop disproves Walker's observations that Defendant was nervous and was not making eye contact.  The Court disagrees.  The video is, at most, ambiguous as to whether Walker accurately described Defendant's behavior.  Defendant makes some eye contact with Walker during the

conversation, but also repeatedly looks away as the two are talking. Moreover, contrary to Defendant's argument at the evidentiary hearing, Defendant does not remove his sunglasses until a few minutes into his conversation with Walker. Upon its review of the video, the Court cannot conclude that Walker's description of Defendant's behavior during the traffic stop was inaccurate.

As a final matter, Defendant argues that Walker lacked reasonable suspicion to pull Defendant over in the first place because Defendant had not committed any traffic violation. The Court disagrees. At minimum, Walker's testimony was sufficient to prove that Walker had reasonable suspicion to believe that the objects on and above Defendant's dash obstructed Defendant's view in violation of California Vehicle Code § 26708(a)(2), which states: "[a] person shall not drive any motor vehicle with any object or material placed, displayed, installed, affixed, or applied in or upon the vehicle that obstructs or reduces the driver's clear view through the windshield." Walker testified that before initiating the stop, he "could clearly see the objects that would have been obstructing [Defendant's] view" as Defendant was driving. In an attempt to disprove that fact, Defendant offered at the hearing the testimony of Jose Leano, who works as an investigator for the Federal Defenders Office of San Diego. Leano testified that, after viewing the body camera video, he guessed that the die hanging from the rear-view mirror was approximately one square inch and the figurine was approximately two inches tall by one inch wide. (Evidentiary Hr'g Tr. at 33–34.) Leano testified that he believes these objects did not obstruct Defendant's view of the windshield. (*Id.*) On cross-examination, Leano stated that his measurements were only estimates, he had not actually sat in Defendant's car or physically measure the objects himself, and he does not "personally know if those objects actually obstruct the view from the driver's seat." (*Id.* at 38.)

The Court concludes that Leano's testimony does not disprove Walker's assertion that he believed the objects were obstructing Defendant's view. What matters here is not whether the objects actually obstructed or reduced Defendant's view through the

windshield, but rather—as noted in the case upon which Defendant primarily relies—whether Walker had reasonable suspicion to believe that the objects on and above Defendant's dash obstructed Defendant's view. *See People v. White*, 132 Cal. Rptr. 2d 371, 375 (Ct. App. 2003) ("We must determine whether it was objective reasonable for [the officer] to believe that the air freshener [hanging from the rear-view mirror] obstructed or reduced [the driver's] clear view through the windshield so as to constitute a possible violation of the Vehicle Code."). Walker's testimony that he had a "clear" view of the objects prior to the stop and that the objects appeared to him to obstruct Defendant's view make this case different from *White*, where, the court explained, "[i]t is worthy of note that the officer *never testified* that he believed the air freshener obstructed the driver's view." *Id.* (emphasis added). The Court concludes that, prior to the traffic stop, Walker had at least a reasonable suspicion that Defendant was violating § 26708(a)(2). As a result, the traffic stop complied with the Fourth Amendment.[3]

### III. Conclusion

For the foregoing reasons, the Court concludes that relevant objective reasonable suspicion supported Officer Walker's initiation of the traffic stop as well as the dog sniff. The Court therefore **DENIES** the motion to suppress.

**IT IS SO ORDERED.**

Dated: December 7, 2017

Hon. Gonzalo P. Curiel
United States District Judge

---

[3] The fact that Defendant's potential violation of § 26708(a)(2) was not the "real" reason Walker initiated the traffic stop makes no difference in this analysis. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").